# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| JUSTIN GREENUP <br> 6 Johnamac South <br> Littlestown, Pennsylvania 17340, <br><br> Plaintiff, <br><br> v. <br><br> CSX TRANSPORTATION, INC. <br> 4724 Hollins Ferry Road <br> Baltimore, Maryland 21227, <br>    SERVE: The Corporation Trust <br>    Incorporated <br>    351 West Camden Street <br>    Baltimore, Maryland 21201-7912, <br><br> Defendant. | * <br> <br> * Civil Action No._____ <br> <br> * <br> <br> * <br> <br> * <br> <br> * <br> <br> * <br> <br> * <br> <br> * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT PURSUANT TO THE FEDERAL
## RAIL SAFETY ACT AND REQUEST FOR JURY TRIAL

COMES NOW the Plaintiff, Justin Greenup by and through counsel, P. Matthew Darby, Esq., H. David Leibensperger, Esq. and Berman, Sobin, Gross, Feldman & Darby LLP and files this Complaint pursuant to the Federal Rail Safety Act, 49 U.S.C. § 20109, and states as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Justin Greenup is a citizen of Pennsylvania.

2.      Defendant, CSX Transportation, Inc. ("CSX") is a railroad corporation incorporated in the state of Florida, and was at all times relevant to the events described in this Complaint doing substantial business within the jurisdiction of this Court, engaging in the

carrying of passengers for hire between and through Maryland and the several States of the United States.

3. This Court has original federal question subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 and the Federal Rail Safety Act, 49 U.S.C. § 20109(d)(3).

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) inasmuch as a substantial part of the events or omissions giving rise to this claim occurred in Maryland, and 28 U.S.C. § 1391(b)(2) inasmuch as CSX was at all times relevant to the events described in this Complaint doing substantial business within the jurisdiction of this Court, engaging in the carrying of passengers for hire between and through Maryland and the several States of the United States.

## FACTUAL ALLEGATIONS

**A.** **Introduction.**

5. This Complaint arises out of violations of the Federal Rail Safety Act, 49 U.S.C. § 20109 ("FRSA"). On or about XXX, Mr. Greenup filed a Federal Rail Safety Act ("FRSA") complaint with the United States Department of Labor - Occupational Safety and Health Administration ("OSHA").

6. At the time CSX's FRSA violations discussed herein, Mr. Greenup was employed by CSX, and qualified as an employee within the meaning of the FRSA.

7. Mr. Greenup engaged in activity protected by the FRSA, and was subsequently subject to adverse and discriminatory action as a result of that protected activity and CSX interfered with Mr. Greenup's medical treatment.

8.  Mr. Greenup's protected activity concerned his reporting of a work-related personal injury, a hazardous safety condition of malfunctioning equipment, and seeking medical treatment.

9.  Mr. Greenup began his employment with CSX in 2014, and worked as a conductor until he was terminated from his employment in violation of the FRSA on December 2, 2015.

**B.  Mr. Greenup is injured at work, reports his injury to CSX, and CSX discourages him from reporting the injury and interferes with his medical treatment.**

10.  On or about March 31, 2015, Mr. Greenup was working for CSX as a conductor on Train D785 in the Hagerstown yard. The engineer on the train was Aaron Becktall (phonetic).

11.  On that date, Mr. Greenup was switching trains and knocking brakes off, when he hit a lever to release a brake on a flat rail car and the handle snapped back onto his hand and he injured his right hand. Mr. Greenup's hand swelled considerably, and he thought it might be broken. Mr. Greenup reported the injury to his hand, as well as his suspicion that it might be broken, to Yardmaster Joe Downs. Yardmaster Downs then asked Mr. Greenup if he was sure he was injured, and stated, "You don't want to do this, it will make your life harder, go home and say the injury happened at home." Yardmaster Downs escorted Mr. Greenup to Trainmaster Rick Keller's office. Yardmaster Downs called Trainmaster Keller who said he would come in to meet with Mr. Greenup.

4.  An Amtrak employee and former CSX employee, a Mr. Johnson, told Mr. Greenup to "shop" the rail car that injured his hand (meaning report that the equipment malfunctioned so that it could be inspected and repaired) and to take photos of the rail car in question or it "would disappear". Yardmaster Downs told Mr. Greenup not to do this.

5.  When Trainmaster Keller arrived, Mr. Greenup reported his injury to him, and informed Trainmaster Keller that he believed his hand might be broken. Trainmaster Keller likewise told Mr. Greenup not to report his injury and told Mr. Greenup not to shop the rail car or take pictures. Trainmaster Keller also interfered with Mr. Greenup's medical treatment by convincing him not to seek medical attention for the injury to his hand.

6.  The following day when Mr. Greenup arrived at work, the swelling in his hand had gone down, and it was feeling better. Trainmaster Keller told Mr. Greenup that the previous day he had also thought Mr. Greenup's hand was broken, that Trainmaster Keller was relieved that it was not broken, but that it was good that Mr. Greenup had not formally reported the injury.

C.  **CSX retaliates against Mr. Greenup for reporting his injury by concocting an illegitimate attendance charge, scheduling a formal hearing on the charge, then cancelling the hearing and terminating Mr. Greenup for not marking back up for work quickly enough on the day of the cancelled hearing.**

7.  Thereafter, in retaliation for Mr. Greenup's protected activity of reporting his injury and the malfunctioning equipment, CSX began a campaign of subjecting Mr. Greenup to discriminatory extra scrutiny, above and beyond that to which it subjects its other employees and there was a noticeable negative change in attitude toward Mr. Greenup by his supervisors.

8.  Beginning May 4, 2015 Mr. Greenup had approved leave for surgery for an unrelated cyst on his hip; he returned to work August 24, 2015.

9.  On September 17, 2015, CSX sent Mr. Greenup a discipline letter for marking off from work due to an asthma attack he had on September 10, 2015. The letter informed Mr. Greenup that he had reached a 20-point threshold under CSX's Crew Attendance Policy System (CAPS), and "your next attendance handling will result in formal discipline."

10. Mr. Greenup had no attendance policy violations after that. Yet, on September 28, 2015 CSX sent Mr. Greenup a letter informing him of a formal investigative hearing being held on October 1, 2015 because "you have reached or exceeded the threshold for discipline handling under CSXT Crew Attendance Policy System (CAPS), on or about September 21, 2015." The letter went on to inform Mr. Greenup, "You must be fully rested under the FRA Hours of Service Law to attend the scheduled investigation," meaning he would have to mark off from service prior to his hearing.

11. However, the letter was not timely mailed or delivered, and Mr. Greenup was not informed of the hearing until September 31, 2015, the day before the hearing, when a union official called him regarding the hearing

12. On September 30, 2015, CSX sent Mr. Greenup a letter postponing the hearing to October 14, 2015.

13. Then, on October 13, 2015, the day before the re-scheduled hearing, at 8:10 a.m., Trainmaster Keller received an email that Mr. Greenup's hearing was being cancelled (presumably because Mr. Greenup had not actually committed any attendance policy violation). Trainmaster Keller did not inform Mr. Greenup of this.

14. At approximately 12:02 p.m. on October 13, 2015, Mr. Greenup marked off work, because he believed the hearing was going forward the following day, and per the September 28, 2015 letter discussed above, he was required to be fully rested under the FRA Hours of Service Law to attend the scheduled investigation.

15. At approximately 3:30 p.m., Trainmaster Keller called Mr. Greenup and informed him the hearing for the following day was cancelled, and told Mr. Greenup to mark back up for work. Keller did not, however, tell Mr. Greenup he was needed for work that night, nor did he

give Mr. Greenup any warning regarding any consequence for not marking back up for work that night.

16. At approximately 11:52 p.m., Mr. Greenup marked back up for work by following the normal procedure and calling CSX's automated employee service phone number, known as the IVR. Mr. Greenup used the IVR system has he normally would have. He marked up at 11:52 p.m. because of parental responsibilities, and his expectation that he was not supposed to work that evening.

17. However, unbeknownst to Mr. Greenup, the IVR did not register Mr. Greenup's commands and did not mark him back up. Although Mr. Greenup had used the IVR before, he had never received any training from CSX on its operation. When Mr. Greenup was not immediately called into work he was not aware that there was any problem, because an employee who comes back after being marked off from work goes to the bottom of the board, and he was only usually expected to work every two to three days.

18. On October 13, 2015 CSX also sent a letter to Mr. Greenup, cancelling the hearing scheduled for the following day. Mr. Greenup did not receive the letter until October 15, 2015 (the day after the hearing was scheduled to take place).

19. The next day, October 14, 2015, Trainmaster Keller saw that Mr. Greenup had not marked back up, but did nothing. He did not call Mr. Greenup to determine if there had been any mistake or misunderstanding. Instead, he called his superiors to inquire about disciplining Mr. Greenup. Mr. Keller consulted John Wright, Division Manager of the Baltimore Division, and they discussed charging Mr. Greenup with insubordination. That same day, Keller charged Mr. Greenup with insubordination, but told Mr. Greenup no decision had been made.

20.     On October 16, 2015, Trainmaster Keller called Mr. Greenup, scolded him for not having marked back up, and told Mr. Greenup he was being terminated for insubordination. During these communications, Trainmaster Keller never informed Mr. Greenup of any allegation that he was short on manpower, or had to stop certain railcar deliveries due to Mr. Greenup's absence.

21.     On October 20, 2015, CSX sent a letter to Mr. Greenup to attend a formal investigative hearing on October 21, 2015 based "information received on October 14, 2015, that on October 13, 2015, you failed to follow instructions of your supervisor." The letter also informed Mr. Greenup that, "You are being held out of service pending this investigation," and thus he was not receiving any pay.

22.     Disciplining Mr. Greenup by removing him from service without pay prior to the hearing violated B&O Schedule Agreement Rule 17, which provides that "No employee shall be disciplined without a fair hearing by a proper officer." CSX also sent another letter that same day that the hearing was postponed to October 27, 2015.

23.     On October 27, 2015 CSX sent a letter to Mr. Greenup postponing the hearing to November 3, 2015.

24.     On November 3, 2015, CSX held its hearing on the insubordination charge against Mr. Greenup. Brian Stussie, Terminal Superintendent of the Baltimore Division was the conducting officer of the investigation. Mr. Stussie's supervisor was John Wright, Division Manager of the Baltimore Division, who had instructed Mr. Keller to bring the charges against Mr. Greenup. Mr. Stussie made clear throughout the hearing transcript that he was acting more as a prosecuting officer, rather than an unbiased judge, and pointed his questioning toward finding Mr. Greenup guilty of the charges, rather than neutrally evaluating the evidence.

Disciplining Mr. Greenup by holding a hearing conducted by a subordinate of the person who ordered that charges be brought against Mr. Greenup violated B&O Schedule Agreement Rule 17, which provides discipline may not be meted out "without a fair hearing by a proper officer."

25. During the hearing, Trainmaster Keller alleged that he had to cancel trains (despite that Mr. Greenup was part of an "extra board" of employees who are only called to fill vacancies left by other employees), any of whom could have been called in, and despite that Keller had never bothered to call Mr. Greenup to inquire as to his whereabouts prior to allegedly cancelling the trains). Trainmaster Keller never made this allegation when he spoke to Mr. Greenup on October 16, 2015.

26. When Mr. Greenup was asked during the hearing if he was insubordinate for not marking up, he replied that he was not insubordinate because, "I was not dishonest, I was not disloyal, I was not quarrelsome and I was not insubordinate because I attempted to mark up."

27. On December 2, 2015, CSX sent a termination letter to Mr. Greenup stating "it has been determined that you violated CSX Transportation Operating Rule 104.2 [CSX's insubordination policy]…you are dismissed in all capacities…effective immediately."

28. Despite that Mr. Greenup had not yet received a fair hearing, he was taken out of service by CSX without pay, prior to the November 3, 2015 hearing, in violation of B&O Schedule Agreement Rule 17. He continued to be out of service without pay until December 2, 2015, when his employment was terminated, in violation of B&O Schedule Agreement Rule 17. The hearing itself also violated B&O Schedule Agreement Rule 17 because it was not a "fair hearing by a proper officer." Moreover, despite that Mr. Greenup had not purposefully disobeyed Trainmaster Keller, that he substantially complied with Trainmaster Keller's instruction to mark back up for service by actually marking back up using the IVR (but the IVR

system failed), and despite that Mr. Greenup was ready, willing, and able to work had Trainmaster Keller simply called him to determine if there had been any mistake, Mr. Greenup was charged with insubordination and terminated.

29. Mr. Greenup was also subjected to a phantom hearing for a supposed attendance violation. Neither the attendance violation nor the hearing ever actually occurred. It was CSX's act of charging Mr. Greenup with a non-existent attendance violation, and then failing to notify him in a timely manner that the hearing had been cancelled, that led Mr. Greenup to have to mark off and then later unsuccessfully mark back up. CSX has never provided any reason for why Mr. Greenup was charged with an attendance violation that never occurred, nor any reason why the hearing on the supposed violation was ultimately cancelled a day before it was scheduled to occur

30. The phantom attendance policy violation and hearing, and the severity of the discipline to Mr. Greenup for the failure of the IVR system was well out of bounds of rational discipline. Mr. Greenup was placed under unwarranted discriminatory scrutiny, charged, disciplined, and discharged unlawfully and purely as a result of CSX's efforts to harass and intimidate Mr. Greenup and to chill the reporting of work-related injuries, equipment failures, and safety concerns.

## COUNT I – Violation of Federal Rail Safety Act

31. Plaintiff adopts and incorporates by reference all the facts and allegations set forth above.

32. Mr. Greenup engaged in protected activity under the FRSA when he reported, in good faith, his injury, and a hazardous safety or security condition as outlined herein.

33. CSX had knowledge of all the protected activities referenced herein.

34. CSX interfered with Mr. Greenup's medical condition by discouraging him from seeking medical treatment.

35. CSX took adverse or unfavorable actions against Mr. Greenup in whole or in part due to his protected activities as outlined herein. In so doing, CSX acted with reckless and callous disregard for the law and Mr. Greenup's rights under the FRSA.

36. On May 19, 2016, Mr. Greenup filed an FRSA Complaint with the Secretary of Labor's OSHA Whistleblower Office.

37. The OSHA Whistleblower Office commenced its investigation, and Mr. Greenup fully cooperated with OSHA's investigation. However, OSHA did not issue a final decision within 210 days after the filing of the FRSA Complaint. The delay was not due to any bad faith on the part of Mr. Greenup.

38. On or about April 13, 2017, Mr. Greenup filed with the OSHA Whistleblower Office a Notice of Intent to File Original Action.

WHEREFORE, in order to encourage employees to freely report, in good faith, personal injuries and hazardous safety or security conditions without fear of any retaliation, thereby ensuring the Federal Rail Administration has the necessary information to develop and administer an effective rail safety regulatory program that promotes safety in every area of our nation's railroad operations, Plaintiff Greenup demands a Judgment under the FRSA for all relief necessary to make him whole, including but not limited to:

  a. Expungement of all references to disciplinary action related to the discrimination;

  b. Reinstatement with the same seniority status Plaintiff Groom would have had but for the discrimination;

c. Lost benefits with interest;

d. Lost wages with interest;

e. Compensatory damages for medical expenses incurred due to Bombardier's conduct;

f. Compensatory damages for economic losses due to Bombardier's conduct;

g. Compensatory damages for mental anguish, emotional distress, and the physical results thereof, due to Bombardier's conduct;

h. The statutory maximum of punitive damages pursuant to 49 U.S.C. § 20109(e)(3);

i. Special damages for all litigation costs including expert witness fees and attorney fees; and

j. All other relief necessary to make Plaintiff Greenup whole.

**PLAINTIFFS DEMAND TRIAL BY JURY**

Respectfully submitted,

_____/s/_____
P. Matthew Darby
(Federal Bar No. 5980)
H. David Leibensperger
(Federal Bar No. 16676)
Berman, Sobin, Gross, Feldman
& Darby LLP
1301 York Road, Suite 600
Lutherville, Maryland 21093
Ph. (410) 769-5400
Fax: (410) 769-9201
pmdarby@bsgfdlaw.com
hdavid@bsgfdlaw.com
*Counsel for Plaintiff*